Thank you Mr. Conway. The next case is Gephardt v. The United States Air Force. Mr. Guillaume? Mr. Guillaume. Guillaume. Excuse me. Please proceed. Recognization of a French... Yes. Yes, Your Honor. I'm representing Mr. Gephardt as Administrator of the State of Bradley-Simmons. This morning we're here to argue whether the MSPBR error in reversal its own Administrative Judge's decision regarding a charge of attempted obstruction of investigation and the Administrative Judge's decision to mitigate the agency's removal penalty to a three-day suspension. Given the evidence and the testimony that was heard at a two-day hearing before the Administrative Judge, we believe that the MSPB error in reversing those charges and this court should affirm the ALJ's... Well, we're only reviewing one thing, and that's the Board's decision. So we don't consider the Administrative Law Judge independent of the Board. But it's part of the record, so you may proceed. As far as... We did mention one other issue. Am I supposed to push the button here? No, no. You're fine. Go ahead. We did mention another issue, and that was destruction of information and property. We felt that the MSPB had put way too much emphasis on that particular issue, essentially put undue information or emphasis on it. Essentially, that particular charge was sustained by the Administrative Judge. We don't argue that it ought to be reversed. However, just an explanation, because it did have an effect, we believe, on the overall decision to reverse the penalty. Basically, Mr. Simmons had... They didn't reverse the penalty. The Board didn't reverse the penalty. The Board upheld the penalty of the agency, isn't that correct? They upheld the penalty of the agency, Your Honor, but they reversed their own judge on the penalty. Well, this was the point that Judge Rader needs to help you put in focus, which is the issue before us is not whether the AJ was right or wrong. The issue before us is whether the Board is right or wrong, because it's only the Board... The AJ acts for the Board unless the Board acts for itself. And here, the Board acted for itself. So the question is, what has the Board done wrong? Okay. I believe the Board put too much emphasis on this particular destruction issue. Essentially, what we had was there was a server in the server room where my client, Mr. Simmons, worked, and there were some serious problems with it. Parts had been changed out. And on one occasion, the case of the server actually got replaced, and the motherboard, which has the logic boards and so forth, remained. And that was uncontroverted at the hearing. So this resulted in a mismatch between what was in the database on the IPMS, you can see that in the transcript, IPMS, and what was actually in the server room. Well, what Mr. Simmons did is he realized that there was this mismatch, and it was merely a mismatch in the database. He scratched the serial number off that server to correct an error. That was the extent of what he did. And you saw in the initial opinion, essentially the judge said all the agency proved was that Mr. Simmons had scratched off the serial number, destroyed a 20-cent sticker, and he did so to save the Air Force time and money of probably having to conduct another investigation into a missing server or a server problem. Now, the main issue here, we believe, is the attempted obstruction charge, and we believe that was an error and not supported by substantial evidence. Well, that's where the board reversed it and went differently. Correct. Where is the error in the board's assessment that your client obstructed this investigation? Okay. The board continuously referred to an issue of a missing server. The key here is that there was a server, number 236, that was thought to be missing. There was a problem in an inventory. This senior Airman Phillips. We remember the facts. But then they start the investigation. What happens at that time with Mr. Simmons? The point is, Judge, the investigation was based on false information. If you look at index number 104 and 109, there's a reference in there from this Airman Florence that says this server, 236, was last seen in the server room in May of 2001. Well, he also says in a statement to the report survey investigator that initiated the investigation that he noticed it in the server room. It was in a crate. We got in a hearing, and this now Sergeant Florence testifies, he said he noticed it because he really didn't want to imply because he really didn't see the server. So the whole investigation into a missing server was based on this information, misinformation from this Airman Florence. And so what we end up with is constant, repeated. Sir? In your brief, you make the following comment. You say the MSPB opinion in order provided extensive commentary regarding Simmons' statements to the OSI agents. At the end of this commentary, the MSPB states that, quote, it was not appellant's place, however, to determine that the agency's investigation was unnecessary, and he had no right to address what he saw as a problem by committing deceptive acts and omissions in an attempt to thwart the agency's efforts. And that's what the board said. And you said there's no supporting evidence for that. Is it your position that whatever the appellant's duties were at the agency, they included determining whether an agency's investigation was necessary and that he had the right to address what he saw as a problem by committing deceptive acts? Is that your position? In part, yes. Because I don't think he had a right to commit deceptive acts, but what he did was not a deceptive act. Well, did he have a duty under his assignments to determine whether the agency's investigation was necessary or unnecessary? No, but I qualify that by saying that. So the board's statement to that effect is correct. But I would qualify that, Your Honor, by saying there were repeated times when people would come into Mr. Simmons' room and look for this server and ask him to do things like call Hewlett Packard, like write letters, like do this and that, and there were numerous people who were involved in this investigation. That's in the transcript. That's in the evidence. What Mr. Simmons found was that there really was no missing server. And in the overall hearing, that was the end result. There was no missing server. So all of this investigation in the missing server really was for naught. And it was his job to make that finding? Well, after being asked numerous times to look for a missing server that he knows is not missing, then he took an action he probably shouldn't have taken in scratching off the server, but he did so to try to save the government money. He didn't do it as a deceptive act. But can he—is that his job to decide that, well, I'm going to substitute this server for the missing server and save the government money? That's not what happened, Your Honor. Isn't that what he says happened? No. Didn't he say himself that I was only doing this for the good of the Air Force and to save money? But he wasn't doing it to substitute this server for the missing server. To ensure there was not another needless report of survey. There was no missing server, is the point. There was a problem in the database, a different serial number that was in the database because of the swapping out of this case. And is it his job to take matters into his own hands and outside of the normal procedure of correcting that error, which would be to go back and correct the database, he says, well, I'll just scratch this off and put a number in there and then nobody will notice. Actually, what he did was he spoke to the equipment custodian, Florens, whose responsibility—he had the hand receipt for this particular server. He spoke to him. He asked Florens to go out and get a serial number sticker, which is— Why didn't he just tell someone of his perception of the solution rather than taking matters into his own hands? I can't answer that question, Your Honor. But doesn't that lead to the problem? It is part of the problem. And doesn't the government's penalties somewhat find justification in the fact that if they can't trust people to approach them with their view of the problems and just try and solve them on their own, then there'd be chaos within the supply core, wouldn't there? I think the fact that there was this repeating search for a server that people knew was not missing and the fact that he thought he could come up with a way to solve this problem and prevent another investigation from occurring, he did what he did. He may have acted in perfectly good faith. And, in fact, what he did may have been a very reasonable thing to do in terms of saving the government money. But the question before us, counsel, is whether the board erred in saying that by these actions he was attempting to obstruct the OSI investigation. And it's hard for me to see how, as well-meaning as he may have been, that didn't obstruct or at least attempt to obstruct the investigation. Doesn't it seem to you that the board was at least within the range of reasonableness? Because we have to find that the board acted arbitrarily, capriciously, like a bunch of idiots. Nobody in their right mind could have ever thought this. Don't you think that it was within the board's purview to say, golly, no matter how good a guy he thought he was, he was sort of getting in the way of this investigation? No, I don't, Your Honor. Simply because, first of all, there was no reason for this investigation to go along in the first place. But that wasn't his call, was it? And your comment about obstructing the OSI investigation, that wasn't the investigation that anybody was charged with obstructing in the first place, or attempting to obstruct. Because if you look at what Mr. Simmons did with regard to the OSI investigation, he was open, honest, and cooperating. Even the OSI investigators said, oh, he cooperated fully. He volunteered to come in and talk. He volunteered to give a polygraph. And it showed that he told the truth. So as far as the OSI investigation, that wasn't a problem. And it really was never clear which investigation he supposedly attempted to obstruct. Maybe the government will help us on that. You're in your rebuttal time. Thank you. Major Kirkpatrick? Yes, Your Honor. May it please the Court, Your Honor has asked about Mr. Simmons' job description. And let me tell you what that job description did say. You can find it at Supplemental Appendix pages 2 to 4. Mr. Simmons was supposed to exhibit honesty and integrity and protect government property. Those are direct quotes from the job description. And he did just the opposite. And what he did was derail this investigation into missing expensive government computer equipment. How did he obstruct the investigation, which is the issue I get?  The investigation, Your Honor, would have been the report of survey investigation that was being undertaken by Mr. Polsey. The charges attempted obstruction, not actual obstruction. And that's what's— How did he attempt to do it? By scratching out a serial number during the investigation on the server equipment that was the subject of that investigation. Now, it's not an actual obstruction because Mr. Polsey testified at the hearing that it had no impact on his report of survey investigation that he was conducting. He was trying to save you money. Doesn't that enter into this at all? Your Honor— Trying to save you what he perceived as an awful lot of waste of time and effort already?  This is a GS-12 employee who's charged with keeping track of these services, information and technology specialists. The determination of what to do when there's a mix-up with serial numbers and paperwork and a possible missing server, the correct thing to do is a report of survey investigation. So he made a mistake. He made it for the best of intentions. Doesn't that enter into this at all? No, sir. In fact, in the Douglas factors, the deciding official, Mr. Weber, found that this was done for some form of gain because if this is a missing server, it's possible that it could adversely affect Mr. Simmons' reputation in the workplace. That's in the Douglas factors in your supplemental appendix. Major, how long did this investigation go on? From 2002 until approximately sometime in 2003 was when the actual report of survey investigation got started. And what was the ultimate resolution of that investigation? What was the outcome? The outcome of the report of survey investigation was that no one should be held liable for a missing server. Meaning no server was ever missing? That's correct. So in point of fact, Mr. Simmons was right that it wasn't a server missing. It's just a mix-up on the serial numbers. He absolutely was not right on it. That's incorrect to say. Why is that incorrect? His job was to cooperate with the report of survey that was ordered by his higher-ups. Well, I understand that. But with respect to the servers and all of the – what started this whole thing going was the fact that a server was missing. And Simmons apparently was aware of the fact that there was an extra server. And it seems to me this is just two and two is four. It takes a year to investigate this, and the outcome is no server is missing? That's correct, Your Honor. Something is missing in my understanding here. What I refer you to is the testimony of Mr. Weber, the deciding official. Appendix page 77. He was asked that same question at the administrative hearing by Mr. Guyot. 77? Appendix 77, testimony of Mr. Weber. But you had the right number of serial numbers. You just didn't have the right numbers in the database. That's the question from Mr. Guyot. And the answer from Mr. Weber is that's why we were doing the investigation. We're accountable for this equipment to the taxpayers. I've stopped my quote of Mr. Weber's testimony. It ended with that's why we were doing the investigation. But there's accountability here. And what Mr. Simmons did was prevent the agency from getting to the ground truth about what happened to that server. The point of the report of survey process is to find out if any one individual should be liable for the lost property. Was he preventing the agency from getting to the truth, or was he trying to convey the truth to the agency to spare the agency all the aggravation of investigating something that didn't need to be investigated? Well, I'd point to Mr. Simmons' previous statements on that, Your Honor. This story about only fixing an incorrect number, that didn't materialize until the MSPB hearing some 18 months later. His previous statements, Supplemental Appendix, page 69, the testimony of Master Sergeant Goss, the first guy to notice that the serial number had been scratched out. What Mr. Simmons said then was, what are you going to do? Call in OSI, our criminal investigators, and dust for fingerprints. He didn't say anything about, well, the number was wrong, so I fixed it. When he gave his statement to the report of survey investigator in December 2002, page Supplemental Appendix 9, he made a vague, unhelpful statement that this server is lost in the ghost of the bureaucracy of the air force. He didn't say anything about, well, the number was incorrect, and I fixed it. The same thing when he was interviewed by OSI agents twice in April 2003. All he said is that someone might have scratched it out. No legitimate explanation like it was incorrect and I fixed it. He saved that for the hearing. Now, what he did say when he made his personal appearance to Mr. Weber, the deciding official, Supplemental Appendix, page 49, Weber was told by Mr. Simmons that Simmons had done something stupid. Now, if he did something stupid, that's inconsistent with correcting an incorrect number. Something came up at the hearing. I don't think you should believe him. I take it, Major, it's your position that the issue in this case is not whether anything ever actually went wrong or whether anybody should actually have been prosecuted or sanctioned, but the question is if the Air Force decides to investigate what they think is a problem, everybody should line up and cooperate. Is that your position? That's a big part of it, Your Honor. And do we want to keep an employee who's only been with us for 18 months and derails that type of investigation on his own initiative, even assuming he had the best of intentions, which I certainly don't concede. And I take it it's your position that if the Air Force decides you don't want to keep that employee and the board supports you, why should we do something different? Well, the standard review you've touched on, Your Honor, is very favorable to the agency in this case. The decision of the board should be affirmed unless it's arbitrary and capricious in abuse of discretion, not in accordance with law, or unsupported by substantial evidence. And there's no claim of procedural problems with this case, so that's the standard that we've got. And it's a very hard one for the petitioner to overcome in this case. There's no doubt at all about the two charges that were affirmed by the MSPB. The first one is that he did willfully destroy government property and information. He admitted that once confronted by the OSI investigators, and although his story fluctuated a bit, Mr. Simmons never backed away from that admission. As for the second charge, the attempted obstruction of an official investigation, his intent is pretty clear. If you look at the testimony of the OSI investigators, Supplemental Appendix, page 61, Mr. Guyot asked Special Agent Tomlins on the record, is it possible that he did this to prevent another future report of survey? That's an argument they make in their reply brief. And the direct testimony answer from Agent Tomlins is no. It was to stop the report of survey that's being done. He was attempting to stop this ongoing report of survey, and it just wasn't his call to make. One other question I have is I take it that you and Mr. Guyot are in agreement that it's okay for us to be listening to you today and listening to him. That is, he has standing before us as the successor in interest to the deceased. Yes, Your Honor. The appeal was filed before Mr. Simmons died, and there is money on the table. The agency provided interim relief after the administrative judge's opinion, not full relief. So he still has interest, and under the federal rules, there's no reason. Is there any reason for us to have to write anything about that, or do you think that's pretty well understood in the system? We conceded that issue. Okay. Anything further, Mr. Kirkpatrick? The decision before this court is whether or not the MSPB decision is arbitrary and capricious or unsupported by substantial evidence. We're not here to relitigate the facts of the case. One thing in the reply brief is that the petitioner tries to characterize as much of the initial decision as possible as a credibility determination, and that's just not the case. There's no credibility determinations made within that initial decision anywhere. The MSPB was free to completely disregard the opinion of the administrative judge and make its own findings on fact and law under the substantial evidence standard. And that's what they did, and their decision should be affirmed. Thank you. Thank you, Major. Mr. Gillott? In response to some of Mr. Kirkpatrick's comments, he made the statement that the attempt at obstruction was in the investigation that was done by the police survey investigator, that was Mr. Polcy. Definitely not. It was the OSI investigation, wasn't it? No, sir. He made the comment that it was Mr. Polcy's investigation that was obstructed or attempted to be obstructed. That definitely wasn't the case. Mr. Simmons or Mr. Polcy was asked after hearing whether his scratching the serial number off of a different server had any impact on his investigation. He said no, definitely not. It wasn't relevant to his investigation. But the charge was attempted obstruction, not completed obstruction. But then he was also asked, Mr. Polcy was also asked whether Mr. Weber had ever even talked to him about the investigation, whether he thought it might have caused a problem. He said no, did not. So Mr. Weber didn't even know whether that had any effect or could have had any effect on Mr. Polcy's investigation. Mr. Kirkpatrick also made the comment that Mr. Simmons was responsible for keeping track of the servers. Actually, that was Mr. Florence's position. He was the custodian. He was the one who would have been responsible if a server would have come up missing. The comment about Mr. Weber and his Douglas factor analysis and whether what Mr. Simmons did was for gain of reputation. I think the whole issue of credibility that you just mentioned kind of falls on on this Douglas factor analysis, as well as Mr. Weber's testimony. Mr. Weber continuously refers to a missing server, missing server, missing server in his Douglas factor analysis. There was a missing server. And he knew it. And he testified to it. The very page that Mr. Kirkpatrick cited you to, page 77, or index number 77, in there, I'm cross-examining Mr. Weber about his testimony to the judge. The judge asked him some questions about whether, you know, there was a server missing. And he says, well, he thought that there might have been, but he wasn't sure, so he checked into it. And I asked him, I said, isn't it true, sir? Isn't it true that you had the right number of servers, but you just didn't have the right serial numbers of database? He agreed. So Mr. Weber's credibility, I think, was found to be, you know, lacking in this particular hearing. Another issue with regard to credibility was certainly Mr. Florence's comments. I mean, Florence started this whole investigation by saying it was last seen May 2001 in the server room. He gives a statement saying that he noticed it in 236, specifically noticed 236 in a crate in the server room. And then his testimony at the hearing, I just said that so that people, you know, would maybe think I hadn't seen it. Okay. The way he worded it. The administrative judge saw this stuff. I mean, that's why he decided the way he did. And I don't think the MSPB took a good look at that and made their decision with regard to the credibility, changing the credibility of determination of the judge. Okay. Let's see. He made the comment that Mr. Simmons had referred to scratching off the serial number to the OSI. He certainly did. When he was asked about it, he said, yes, I did it. He also told Mr. Weber in his statement to Weber, in his interview with Weber, that he had done it. So he wasn't trying to hide the fact that he had done that. Thank you, Mr. Goulart. All right.